IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 11, 2004

**STATE OF TENNESSEE v. CHRIS GRUNDER**

**Direct Appeal from the Circuit Court for Bedford County**
**No. 15167    Charles Lee, Judge**

─────────────

**No. M2003-01823-CCA-R3-CD - Filed January 5, 2005**

─────────────

The Defendant, Chris Grunder, was convicted of especially aggravated kidnapping, aggravated rape, aggravated assault, and theft of property over $500.00.  The trial court sentenced the Defendant to an effective sentence of thirty-one years.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it sentenced him.  After thoroughly reviewing the record and the applicable authorities, we affirm all of the Defendant's convictions.  Further, we hold that the trial court improperly enhanced the Defendant's sentences in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), and we reduce the Defendant's sentence in accordance with this opinion to an effective sentence of twenty-nine years.  We remand the case for the entry of judgments of conviction consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part;**
**Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, and NORMA MCGEE OGLE, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal); and A. Jackson Dearing, III, Shelbyville, Tennessee (at trial and on appeal), for the appellant, Chris Grunder.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; W. Michael McCown, District Attorney General; Michael Randles and Ann Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This appeal arises from the Defendant's convictions for sexual offenses and other offenses

against G.H.[1]  On November 18, 2002, the Defendant was indicted by the Bedford County Grand Jury for: (1) especially aggravated kidnapping; (2) aggravated rape; (3) aggravated assault; and (4) theft of property over $500.00.  The following evidence was presented at the Defendant's trial:

G.H., the victim, testified that on August 16, 2002, the Defendant and another man brutally beat and raped her and stole her car.  She said that, on August 16, she was at home with her girlfriend, Cynthia Hamm.  G.H. said that she and Hamm each consumed approximately eight to ten beers, and she was accustomed to this amount of alcohol consumption.  G.H. said that she and Hamm began to argue, so she took her beer and left the house.  G.H. stated that she drove her red Pontiac Sunbird on Jackson Street, towards Estill Springs to go walk through the flea market there to "calm down" before she returned home.

G.H. testified that, as she drove down Jackson street, she noticed two white men walking on the side of the road.  She noted that she thought she recognized the shorter of the men as her cousin. G.H. stated that the taller of the two men made a hand gesture, which she believed was a wave.  She explained that she pulled over to the side of the road, and the two men approached the driver's side window.  She stated that, as the men approached, she realized the shorter man was not, in fact, her cousin.  She described the shorter man as "shorter and stockier than the other man."  She stated that she "couldn't see much of his face because "[he had] bushy hair and [a] bush[y] mustache, and he had a scruffy face."

G.H. testified that the taller of the two men was wearing blue jeans, a black shirt, and a vest. She said that the taller man had numerous tattoos covering his forearms.  She described him as having long hair that he wore down and loose, and his hair was lighter in color than the shorter man's hair.  G.H. testified that she later learned that the taller of the two men was the Defendant.  She said she got a good look at the Defendant at that point and later, as she drove the men around, noting that she even remembered that the Defendant's jeans were worn and frayed at the ends.

G.H. stated that, after the men approached her window, the Defendant told her that he had been walking all day, and he asked her if she would give the two men a ride to a friend's house. G.H. said she agreed to give the two men a ride, and they got into her car, the shorter man in the back seat and the Defendant in the front passenger side seat.  She stated that, upon the Defendant's direction, she drove the men to an apartment complex.  G.H. testified that, after the Defendant discovered his friend was not home, the Defendant requested that she drive the men to another friend's house.  As she was driving, the Defendant asked her to stop at a convenience store, where he went into the store and, upon his return, offered her a beer, which she declined.  G.H. said that, as she continued driving the two men to the next location, the Defendant instructed her to turn off Jackson Street just past a sign for "Normandy Dam," on Normandy road.  She stated that, after turning onto this road, she began to get more uncomfortable and frightened, because the area was wooded and remote.  G.H. said that she stopped the car and politely explained that she could take the men no farther, and she requested that the men get out of her car.  At this point, G.H. said, the

[1]It is the policy of this court to refer to victims of sexual offenses by their initials only.

Defendant "snickered" and told her that she "was going to take them wherever [the Defendant] wanted, or [the Defendant] was going to make [her]."

G.H. explained that, suddenly, she was "grabbed from behind." She said that the man in the backseat grabbed her hair and pulled her head backwards. She said that she felt him press a knife against her, underneath her chest. G.H. stated that the Defendant got out of the car and both men dragged her over the center console into the passenger side seat. She said that the Defendant was grabbing and pulling her by the arm, and the other man was holding her hair and pressing the knife against her. She said that the Defendant went around the car and got into the driver's seat, while the man in the backseat held her by the hair and kept the knife against her. G.H. testified that the Defendant drove up the road and turned onto a gravel road, past a truck with a trailer attached, and drove under a train trestle. She said that the Defendant stopped the car and got out, and then he grabbed her by the shirt and the arm, and dragged her across the console out the driver's side door. She said she was kicking and screaming for help, even kicking her shoes off in the process. She testified that the Defendant told the shorter man to "knock out the light" in the car, which he did. G.H. explained that, after the Defendant dragged her from the car, he began beating her and hitting her with his fist.

G.H. testified that she lost consciousness during the beatings, and was unsure of when or how her clothes were removed. G.H. went on, explaining that the shorter man got out of the car, grabbed her by the arms, and pulled her face down across the hood of her car. She said that the Defendant held her head down against the car with one hand, holding her hair against the hood, as he wrapped the other arm around her waist, placing his hand on her stomach. At this point, G.H. testified, she was totally naked. She explained that the Defendant began raping her from behind, first vaginally, then anally. G.H. said that the Defendant next turned her over and held her by the hair and punched her in the face with his fist. G.H. recalled that the Defendant yelled at her that "[she] was fucking getting what [she] fucking deserved." She said that she lost consciousness, but when she awoke, the Defendant had her bent backwards over the hood of her car and was raping her again. G.H. said that she began kicking and screaming and fell to the ground.

G.H. testified that, after she fell down, the Defendant grabbed her by the ankle, dragged her across the gravel, and "slung" her into the car. She said that she remembered the Defendant being on top of her and slapping her in the face. She said that she lost consciousness again, and, when she awoke, the shorter man was on top of her, raping her from behind, as she lay face down on the seat of the car with her neck draped over the center console. G.H. testified that she began kicking and screaming again. She said that the men pulled her from the car and she "was just knocked out." G.H. said that, when she awoke, her car was gone. G.H. testified that she began crawling towards the paved road, but was in so much pain that she collapsed and lost consciousness again. She said that she awoke briefly and remembered bright lights and people in uniform talking to her and wrapping her in a plastic cover. G.H. stated that she did not remember anything else until she was in the hospital and a female voice was talking to her. G.H. testified that the physical and emotional pain she felt was "the worst feeling [she] had ever had." She stated that after spending the night in the hospital and receiving treatment, she spoke with two police officers, one of whom was Detective

Chris Brown. G.H. testified that, after she described her attackers and the events surrounding her assault and rape, she was discharged from the hospital, and she left with Detective Brown. G.H. explained that Detective Brown, following the description she had given to him, drove her to the location of her rape. She said that, at the scene, she pointed out her shirt, which Detective Brown retrieved. Next, G.H. testified, Detective Brown drove her to a parking lot where her car had been discovered. She said that the back window of the car had been broken out, and there were several items inside that did not belong to her. She explained that the Detective bagged these items, specifically sunglasses, a knife, and a lighter. G.H. stated that she found her keys in the car and decided to drive herself home. She explained that she was unable to wear her seatbelt because she had bite marks on her breasts that made it too painful.

After returning home and taking a bath, G.H. testified, she and Hamm went to the Tobacco Discount Outlet to purchase cigarettes. She explained that, when they were turning into the parking lot, Hamm pointed out a man who appeared to fit G.H.'s description of one of the men who assaulted her. G.H. stated that she recognized the Defendant and that he was wearing the same clothes as he had worn the night before, when he raped her. G.H. said that she parked the car and got out. According to G.H,. the man "turned around and gave [her] a look, a shocked look . . . and took off quickly . . . down the street." She explained that she called 911 and told them to send the police because she had spotted one of the men who raped her. G.H. said that she and Hamm followed the man to the location of a house that he entered. She then borrowed a friend's telephone and called 911 again. Shortly thereafter, G.H. explained, she saw the police leading the Defendant out of that house. G.H. testified that she heard the Defendant say he did not know her, and then she heard him tell the police officers that they needed to talk to his friend "Lenny."

G.H. identified the shorts, t-shirt, and shirt that she was wearing on the day of her rape, and she noted that stains and debris that were on the items were not present when she left her home the day of the rape. Further, she explained that the t-shirt was the same shirt she and Detective Brown found at the scene of her rape. G.H. also identified a pair of pants, black shirt, vest, and headband[2] as the clothing the Defendant was wearing when he raped her and when she saw him the following day. She also identified a bracelet and ring that the Defendant was wearing on the day of the rape. She identified the lighter and sunglasses that were found in her car, and she said that the Defendant was wearing those sunglasses the day he raped her. G.H. also identified a pair of sunglasses that the second man was wearing the day of her rape, and testified that these were the sunglasses that the Defendant wore when she saw him the following day. G.H. testified that she turned over to Detective Brown two hairs that she found in her vehicle. She identified photographs of the Defendant's tattoos as being the same as those she saw on the arms of the man who raped her.

G.H. testified that her car was a 1990 Pontiac Sunbird, and she said that she purchased it about one year prior to this incident for "a little over $1,000.00."

---

[2]The "headband" is also referred to as a bandana, which the Defendant was wearing on his wrist at the time of his arrest.

On cross-examination, G.H. testified that she and Hamm occasionally fight when they have been drinking, and sometimes even hit one another. G.H. stated that, before picking up the Defendant and the other man, she drove past them and went to the flea market, and, upon discovering it was not open, she had turned around and was driving back the way she came when she picked up the Defendant and his friend. She stated that she did not talk to the men at all during the car ride, and that she was not in the habit of picking up strangers on the street. G.H. said that she did not flirt with or make a pass at either man, and, although her shorts were short, they were not "that short" on her. G.H. stated that she was not sure if the Defendant bought beer when he stopped at the store, because she never looked into the sack, but the Defendant took a can wrapped in a small brown bag out of the larger sack. She said that when the Defendant offered her "something to drink" she declined because she "already had a beer." She explained that, at that point, no one had made a pass at her or had threatened her. G.H. stated that the Defendant grabbed her first. She said she did not remember with which hand the other man was holding the knife, only that she felt "something sharp" held against her. G.H. stated that the man in the backseat did not hold the knife on her until she had been pulled into the passenger side seat. G.H. stated that both men pulled her clothes off of her. She repeatedly explained that she did not remember the specific number of times she was hit or beaten, because she was frightened and was only concerned with escaping.

Holly Crabtree testified that she, her two children, and her fiancé were returning from Normandy Lake when they saw a woman lying in the middle of the road. She identified this woman as the victim, G.H. Crabtree stated that there was another woman there, trying to approach G.H., but G.H. was screaming "get away from me." Crabtree said that she knew the person who lived in the trailer nearby, so she went there to call 911 while her fiancé stayed at the road to stop traffic. At this point, Crabtree explained, G.H. was wearing only a blue t-shirt. She described G.H. as "hysterical." She stated that G.H. had blood "[c]aked in her ears" and her hair, and she had blood between her thighs, on her face, and on her shirt. She explained that she tried to calm G.H. down while they waited for the police. She recalled that G.H. would not let any man approach her, not even the police or paramedics, and, in fact, a female nurse had to be called in to get G.H. into the ambulance. Crabtree testified that when she asked G.H. what happened, G.H. exclaimed that she was raped and "they did it; they threw me out of the car."

Deputy Nikia Elliot, of the Bedford County Sheriff's Department, testified that, on the evening of August 16, 2002, he responded to a dispatch call about a woman found in the middle of Normandy road. He stated that he arrived about ten minutes later to discover a woman, whom he later learned was G.H., standing in the middle of the road with two other females. Deputy Elliot recalled that G.H. was wearing only a t-shirt and that her face was swollen and beginning to bruise. He characterized G.H. as confused. He said that G.H. would scream for men to get away from her when they tried to approach her. Elliot stated that he heard G.H. repeatedly say "they did this to me." The Deputy said that he retrieved a raincoat from his car and gave it to one of the women, who wrapped the coat around G.H. He testified that he found a pair of white denim shorts on the side of the road, approximately thirty to fifty feet from the turn-off where G.H. said she was raped. He said he placed the shorts in a bag and later turned them over to Detective Brown. Deputy Elliot explained that, while following the ambulance to the hospital that night, he called Detective Brown, and

Detective Brown met him at the hospital. Elliot stated that the road where G.H. was raped runs directly behind the grocery store where G.H.'s car was found. On cross-examination, Elliot testified that he did not remember whether G.H. had blood on her legs or arms, but he did remember that her face appeared beaten and swollen.

Dr. Lynette Adams testified that she is a family practice physician. Dr. Adams explained that, on August 16, 2002, a colleague called from the emergency room and asked her to come assess G.H., because G.H. was "confused and very hostile toward any male contact." Dr. Adams said that she conducted an examination of G.H. and documented her findings, and that she prepared G.H.'s "rape kit."[3] Dr. Adams testified that, when she arrived, G.H. was "very scared and didn't want anyone to touch her." Dr. Adams said that G.H. stated that she had been sexually assaulted, vaginally, anally, and orally.

Dr. Adams recalled that G.H. had numerous bruises and scratches, a laceration on her head, and bite marks on her breasts. She testified that, during G.H.'s pelvic examination, she found "bits of gravel and debris," both on the inside and the outside of G.H.'s body, and "a great deal of trauma to the vaginal area." Further, Dr. Adams said that she found "trauma to the external genitalia." Dr. Adams recalled that G.H.'s anal area was "reddened." Dr. Adams said that she ordered an urinalysis, which indicated the presence of blood in G.H.'s urine. Dr. Adams testified that blood in the urine commonly occurs with physical trauma, and can be caused by, for example, a severe blow to the lower back, which would cause blood to enter the kidneys. Dr. Adams identified numerous photographs that she took of G.H. at the hospital, and she noted the various injuries to G.H.'s face, head, back, arms, and legs. Dr. Adams pointed out the many lacerations and abrasions, swelling and bruising, and bite marks depicted in those photographs. She explained that G.H. was treated for pregnancy and sexually transmitted diseases as a precaution, given medication for her pain, and that her cuts were sutured. Dr. Adams stated that she did not find the presence of semen on the external areas of G.H.'s body.

On cross-examination, Dr. Adams testified that excessive alcohol use can cause blood in urine, but she believed the most likely cause in G.H.'s case was trauma. She said, however, that G.H. did smell like alcohol, and her urine did indicate she had been drinking. Further, Dr. Adams stated that she did not remember blood on G.H.'s arms, legs, or hands, but that the blood was "caked" on her face, and in her hair. Dr. Adams said that cuts like those on G.H.'s face would bleed quite freely.

Michael Tuberville, a DNA[4] analyst in the Tennessee Bureau of Investigation's ("TBI") serology crime lab, and an expert in the area of serology and DNA testing, testified that he tested the

---

[3]A "rape kit" is a kit that allows doctors to examine and treat victims while preserving evidence for law enforcement authorities. Preparation of a rape kit includes, but is not limited to, swabbing any areas where the rapist may have left bodily fluids, and combing the pubic hairs of the victim to collect any foreign substances.

[4]Deoxyribonucleic acid.

evidence received by the TBI in this case, including the rape-kit swabs from G.H.'s vaginal, oral, and anal areas. Agent Tuberville explained that, while he found some male DNA in the victim's swab kit, he did not find enough to compile a DNA profile. On cross-examination, the agent testified that he did not find the presence of any semen on the swab from the anal area. Agent Tuberville stated that he conducted tests of the other evidence submitted to the crime lab, and found no blood on any of the Defendant's clothing or jewelry[5] and no semen on G.H.'s clothes.[6] On re-direct the agent stated that this did not mean that blood and semen were not ever on these items, and on re-cross, he stated that this did not mean that blood and semen were ever on these items either.

Heather Erec, a forensic DNA analyst at Orchid Cellmark, testified that several hairs found in this case were submitted to Orchid Cellmark for DNA profiling. Erek testified that the hairs submitted all contained a root or partial root, but she was unable to extract DNA from these hair roots. Erek said that she also conducted a test on the vaginal swab from G.H.'s rape kit but was unable to identify a male profile.

Steve Jackson testified that he was the co-manager of the grocery store where the victim's car was found. He said that, at about nine or ten on the night of August 16, 2002, he noticed a "reddish color" car sitting in the parking lot. He explained that, when he arrived at work the next day, the car was still in the lot, so he contacted the Police Department. Jackson recalled that, when the police arrived, he approached the car and noticed that it had out of state tags and broken windows. Further, Jackson said that he noticed some articles of clothing and tennis shoes in the car.

Cynthia Hamm testified that she was living with G.H. in August of 2002. Hamm said that, on August 16, 2002, she and G.H. had a verbal argument, and G.H. left and drove away. Hamm stated that she did not see or hear from G.H. until the police arrived and notified her that G.H. was in the hospital in Shelbyville. She said that she took a cab to the hospital and stayed there until G.H. was released on August 17, 2002. She explained that, after G.H. was discharged, she and G.H. left the hospital with Detective Brown. Hamm stated that she rode with G.H. and Detective Brown to the scene of G.H.'s rape and to the grocery store to retrieve G.H.'s car. After the women returned home, Hamm stated, they left to go purchase cigarettes and to visit a friend. Hamm recalled that she noticed a man walking down the street who appeared to fit G.H.'s description of her rapist. Hamm identified this man as the Defendant. Hamm testified that she asked G.H. if that was the man and G.H. said "yes." Hamm said that G.H. then pulled the car "right up on him. He was right in front of the car." Hamm said that the Defendant turned and faced the car and had a "surprised look on his face." Hamm said that the Defendant then "took off down the street . . . running." Hamm explained that she followed the Defendant and "scream[ed] profanity" at him. Hamm said that the Defendant cut through some grass and went into a house. Hamm explained that, although she did not actually see the Defendant enter the house, she "kind of suspected" he had gone into the house, and a "little

_____

[5]Tuberville said there was no blood on the Defendant's blue jeans, vest, t-shirt, underwear, tennis shoes, socks, sunglasses, ring, necklace, baseball cap, bandana, or bracelet.

[6]Tuberville found no semen on G.H.'s blue t-shirt or shorts.

boy told [her], yeah, he did go in there." Hamm said she remained outside the house and G.H. drove up. Hamm said that she went to a nearby friend's house to retrieve a phone, and G.H. used this phone to contact 911 again. Hamm testified that the Defendant tried to sneak out of the side-window of the house. Hamm stated that she yelled to him, and he then came out the front door. Hamm said that he began talking to G.H. She recalled that, "[a]t first he acted like he didn't know her, and then he said that it was his buddy, Lenny, that she wanted . . . that she had him confused with somebody else . . . that he had never been in her car . . . then he admitted to being in the car, but she had dropped him off." Hamm said that the police arrived and arrested the Defendant. Hamm testified that, prior to that day, she had never before seen the Defendant.

On cross-examination, Hamm testified that she and G.H. drank about six beers each, between approximately 11:00 a.m. and 5:00 p.m. on August 16, 2002, but she said she could not be sure about the amount because she was not keeping track. Hamm said G.H. left after they began to argue. Hamm stated that she and G.H. drank "a couple of days a week" at that time. Hamm admitted that, in the past, their arguments had become physically violent, but she denied that there was any physical contact on the day in question. Hamm testified that G.H. was full of "rage" after the rape, and could not stand to be in the city where her rape occurred, "always looking over her shoulder." Hamm said that, when the police arrived at her house the night G.H. was raped, she was across the street at a neighbor's house. She estimated that it might have been between 8:00 p.m. and 10:00 p.m. Hamm said she remembered it was "pretty late" because she had a difficult time getting a ride to the hospital. She testified that, on August 17, the police were present when the Defendant came out of the house that he entered after she chased him and he was yelling that he did not know G.H.

Detective Chris Brown testified that he is a detective with the Bedford County Sheriff's Department. He said that, on August 16, 2002, he was called to the Bedford County Medical Hospital by Deputy Elliot. He explained that he met the deputy at the hospital, and the deputy gave him a pair of white shorts that the detective placed into an evidence bag and put in his car. Detective Brown said that when he first saw G.H. at the hospital she was on a stretcher in an exam room, and she appeared "severely assaulted." He explained that G.H. did not want any males near her, and, when she heard his voice through a curtain, she became very upset, so he left the room. Detective Brown testified that, at his request, Dr. Adams performed a rape-kit on G.H. and took pictures of G.H. He said that Dr. Adams collected and gave him G.H.'s t-shirt and the hospital sheets from under G.H..

Detective Brown testified that he called in a "be on the lookout for" on G.H.'s car. According to Detective Brown, on August 17, he went to the hospital and picked up G.H. and Hamm. Detective Brown said that G.H. described where she was raped, and he drove to the sign that she remembered. Detective Brown said that G.H. was able to identify the sign and the turn-off, as well as the area where she stopped and asked the men to exit her car. He said that, as he continued driving, G.H. pointed out the trailer that she remembered and the turn-off to the road where she was raped. He stated that they drove under the train trestle at this turn-off, and G.H. identified that spot as the location of her rape. He explained that he got out of the car to look around and noted that the area was not visible from the main road. Detective Brown said that he found an inside-out t-shirt

-8-

at the scene.

Detective Brown said that, as they were leaving the scene, he received a call that the police may have found G.H.'s car. He said that he and the two women drove down the road and turned directly into the grocery parking lot. Detective Brown said that, when they arrived, there was an officer at G.H.'s car, which was parked on the right side of the lot. He said that the back windshield and the interior dome light of the car were broken. He stated that he checked the interior before G.H. approached the car, and that he found "a pair of sunglasses, a cigarette lighter, and a lock-blade style knife that has a clip on it," all of which were items that G.H. said did not belong to her. Detective Brown said that G.H. later gave to him two hairs that she found in her car.

Detective Brown stated that, later that day, he received a call about G.H.'s 911 call. He told the police to "pick up the subject" and meet him so that he could take custody of the Defendant. Detective Brown said that another officer in his department went to pick up the Defendant, and Detective Brown met them at the Bedford County Sheriff's Office. The detective identified the man at the Sheriff's office as the Defendant. Detective Brown testified that he read the Defendant his rights and explained these rights to him, and the Defendant waived his rights. Detective Brown said that, during his interview with the Defendant, the Defendant denied fleeing from G.H. and Hamm that day. He said that the Defendant admitted that he accepted a ride from G.H. on August 16, but claimed that, after stopping for beer, he did not return to the car. The Detective stated that the Defendant said that G.H. and his friend "Lenny" left the store together. The Detective said that the Defendant stated that he purchased beer at the FM Market, but that G.H. said the stop was at an Exxon.

Detective Brown testified that the Defendant said he was wearing the same vest, t-shirt and jeans that he had worn on August 16. Detective Brown said that he took these clothes as well as a bandana, a silver ring, a pair of sunglasses, and a leather bracelet. Detective Brown stated that the Defendant claimed he had gone to a night club on the evening of August 16 at around 9:00 p.m. He said that, during the interview, he had the opportunity to examine the Defendant's person, and that the Defendant had scratch marks across his chest, which the Defendant said he had made with his own nails. The detective said that he supervised the photographing of the Defendant's tattooed arms, and identified these photographs as the photographs entered into evidence. Detective Brown testified that, after the interview with the Defendant, he obtained the surveillance video from the FM Market for August 16, and the Defendant did not appear in the video. He said that he obtained an arrest warrant for Lenny Stewart, the man that the Defendant claimed to be the culpable party, and he checked Stewart's last known address, but he no longer lived there. Detective Brown said that he entered Stewart into the National Crime Information Center, but, as far as the detective knew, this man had not yet been located.

On cross-examination, Detective Brown stated that he did not find a bra or panties at the scene of G.H.'s rape or in her car. He said that, when he interviewed the Defendant, the Defendant gave him a signed written statement. Detective Brown read the Defendant's statement:

> I and Lenny walked to Shamrocks bar on Friday afternoon, played a couple of games of pool and had a beer. We were walking back to Tullahoma when a girl pulled off by the academy and Clayton Homes and asked if we needed a ride. She offered us a beer and drove us around for a few minutes and dropped me off at the FM Market. From there, I went home, got ready to go to the club, spent the rest of the night at the club. Lenny left with her after I got out at the FM Market. It was early evening.

On re-direct examination, Detective Brown said that the Defendant generated his statement at the end of their long interview.

Based on this evidence, the jury found the Defendant guilty of: (1) especially aggravated kidnapping; (2) aggravated rape; (3) aggravated assault; and (4) theft of property over $500.00. The trial court held a sentencing hearing, where the following evidence was presented:

The State entered into evidence the Defendant's pre-sentence report, including a report on a psychiatric evaluation of the Defendant. The Defendant maintained that he was not guilty of the charges for which he was convicted. He testified that the events of August 16, 2002, occurred as he stated in his written statement to Detective Brown, which was also included in the pre-sentence report. The Defendant noted various alleged errors in the pre-sentence report. He said that the amount of his bond was listed incorrectly. The Defendant testified that he gave the police information with which they could locate his co-defendant James Lenny Stewart, including his address and place of work. He stated that, in the presentence report, the offense dated February 7, 2002, for failure to appear in General Sessions Court had been disposed of, along with the offense dated January 25, 2002, for theft of property. He explained that he went to court on these charges and received a sentence of eleven months and twenty-nine days, to run concurrently with the sentence he would receive in the case under submission. The Defendant testified that he received his GED while he was incarcerated in California. He said that he was in jail in California in 1987 or 1988, not 1980 as the pre-sentence report stated. He said that his father lived in Inglewood, Florida, and that he told this to the pre-sentence report officer, despite the fact that the pre-sentence report lists this information as unknown. Further, the Defendant stated that he was not "guarded" when he discussed his family, contrary to the comments made in the report.

The Defendant testified that, at the time of his arrest, he was employed at A & M Contractors, where he worked as a laborer and drove a dump truck. He said that his employment there lasted from August 12 to August 19 of 2002. He testified that, from 1991 until 2000, he owned a tattoo studio. He said that he was divorced but had no children. He testified that he quit school in the tenth grade to take care of his mother and grandmother, not because of "frequent moves" as the pre-sentence report stated. He said that the pre-sentence report inaccurately stated that he did not elaborate on getting his GED, stating, "I told them exactly where I got my GED and why. While I was incarcerated." The Defendant said that the pre-sentence report's statement that he had "several drinks" on August 16 was inaccurate. The Defendant also noted that he did not say that he learned about sex from family members as written in the report, but he learned about sex from friends and in school. The Defendant testified that, contrary to the psychologist's conclusions, based upon

certain psychological testing, he did not "try to present himself in a favorable fashion." He said that he tried to be open and honest with the psychologist. He disagreed with the psychologist's conclusion that he poses a "high risk" of recidivism, stating that he has "never done anything like this in [his] life."

On cross-examination, the Defendant testified that he declined to give a statement to the pre-sentence report officer because he did not want to make any statements without his attorney present. The Defendant stated that Stewart "was a neighbor . . . lived across the way from [him]" and that they became acquainted because "[Stewart] lived across the street from [the Defendant]." He said that he and Stewart did not socialize often, but did go have a beer together on the day in question. He explained that he also occasionally saw Stewart "at the club but not often."

He said that he gave Detective Brown directions as to where Stewart was staying, recalling that he told the detective that Stewart was:

> [S]taying on Anderson Street. There is a dentist, doctor's office right there and there is a building that has an apartment on the bottom and an apartment on the top. [Stewart] was staying with the guy on the bottom. Right there was another building before you get to it. I think it is 104 Anderson.

The Defendant stated that he had been to Stewart's house, but had only stood in the doorway and not gone inside the residence.

The Defendant testified that he was convicted in Coffee County for failure to appear in court. He explained that the court appearance in question was for two traffic citations, and the court date conflicted with a separate court date in Franklin County; he stated that he attempted to call and reschedule, but was unable to "get a hold or do anything about it." He stated that he pled guilty to his charge in Franklin County for failure to appear, and he received a suspended sentence of eleven months and twenty-nine days for that offense. He stated that his probation in that case was revoked after he was arrested on August 17, but, when he discussed the probation violation with Detective Brown on August 17, 2002, his probation had not yet been revoked. The Defendant testified that he also pled guilty to theft in Franklin County. The Defendant admitted that he was on probation in Franklin County on August 16, 2002, when this offense occurred. The Defendant stated that his Franklin County probation had been extended for one year because he had failed to pay the required fines and costs. The Defendant admitted that this occurred prior to his discussion with Detective Brown. The Defendant testified that he was incarcerated in Los Angeles, California, in the late 1980s for possession of methamphetamine. The Defendant stated that he had been arrested for possession of methamphetamine on another occasion earlier that same year in the late 1980s, and did not receive any sentence for that offense. The Defendant stated, "I did a couple of days in jail and was let out as far as I remember."

The Defendant testified that he dropped out of school in the tenth grade and moved to Indiana to care for his grandmother. He explained that his mom was an alcoholic, and his grandmother had

a mentally retarded uncle. He explained that his grandmother "worked [for] Avon," and he went to Indianapolis to assist his grandmother with her work. He testified that he lived there until he moved to California at age 20, when his "house kind of disappeared." He testified that his grandmother and mother both moved into assisted living facilities, and his brother was made guardian of his grandmother, eventually talking her into selling the house. The Defendant said that he and his wife were divorced in September of 2000.

The Defendant testified that, prior to his latest job at A & M Contractors, he worked at Jeff Melton Contractors for over two months beginning in April of 2002. The Defendant stated that he was only unemployed for a few weeks between his job at Melton and his job at A & M. The Defendant stated that, prior to Melton Contractors, the Defendant worked as a painter for "about a month or a little over." The Defendant denied that there was a two month gap between these jobs, contrary to the information provided by the pre-sentence report. The Defendant testified that, before he worked as a painter, he owned tattoo parlors, and before that, he worked various "odd jobs." The Defendant testified that he did not tell the psychologist that he had several beers on August 16, but that he only had one beer that day. Despite the Defendant's disagreement with the psychologist's conclusions, he admitted that he had no training or education in the field of psychology or in the administration or interpretation of psychiatric evaluation tests.

When sentencing the Defendant, the trial court first concluded that the offenses of especially aggravated kidnapping, aggravated rape, and aggravated assault, were separate offenses, that were not required to be merged under the decision of State v. Anthony. The trial court next addressed the mitigating factors applicable to the Defendant's case. The trial court found that the Defendant voluntarily released the victim alive, and this was a mitigating factor for the especially aggravated kidnapping charge under Tennessee Code Annotated section 39-13-305 (2004). The trial court also found that the Defendant attempted to assist the authorities in apprehending the other perpetrator of the offense.

The trial court next addressed the applicable enhancement factors. The trial court found that the five enhancement factors, from Tennessee Code Annotated section 40-35-114 were applicable in the Defendant's case. The trial court stated:

> With regard to enhancing factors, the [c]ourt finds the [D]efendant does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.
>
> The [c]ourt finds that the [D]efendant does have a previous history of unwillingness to comply with conditions involving release in the community.
>
> The [c]ourt does find that the [D]efendant possessed a deadly weapon in the commission of all of these offenses.
>
> The [c]ourt notes with regard to the aggravated assault that that was not an element

of the offense.

With regard to the aggravated kidnapping the possession of the weapon was not an element of the offense and with regard to the rape, it was not an element of the offense as charged in the indictments in each of those cases. Consequently, that enhancing factor may be used in all of the offenses for which the [D]efendant was convicted.

Turning then to the enhancing factors urged by the State upon the [c]ourt, the [c]ourt finds some greater difficulty with. The [c]ourt will find that given the testimony during the course of the trial that 40-35-114 (3) that the defendant was more than a passive participant in the commission of these offenses and did in fact take the role of a leader in the commission of the offense. That enhancing factor should be applied.

The [c]ourt has considered the State's argument as to whether or not the [D]efendant treated or allowed the victim to be treated with exceptional cruelty. The [c]ourt finds that enhancing factor to be applied for the following reasons:

The assault suffered by the victim was not necessary for the commission of any of these offenses, and the manner in which . . . the victim was left after the assault in this [c]ourt's mind is treating one with exceptional cruelty. To ravish one, to subject them to the most heinous physical assault and then to leave them cast on the side of the road like a rag doll . . . is exceptional cruelty.

The [c]ourt cannot find, however, that the personal injuries inflicted upon the victim were particularly great as the serious bodily injury was an element of the offense in the aggravated kidnapping and the aggravated assault. It was not an element of the offense in the aggravated rape case. But I don't know where the turning point as to what is particularly great, but although the jury found and the [c]ourt finds that the victim suffered serious bodily injury, I cannot say that this . . . serious bodily injury . . . was in this case particularly great.

The trial court placed "considerable weight" on the Defendant's prior criminal history, noting that, although his convictions were for relatively minor offenses, these offenses were committed in close proximity of time to his conviction in this case. The trial court sentenced the Defendant to twenty-three years, as a violent offender, at 100% for each of the class A felony convictions, especially aggravated kidnapping and aggravated rape. Additionally, the trial court sentenced the Defendant, as a standard offender, to six years for aggravated assault, and two years for theft of property over $500.00. The court ordered that the sentences for the class A felonies run concurrently to one another, but consecutively with the sentence for aggravated assault and consecutively to the sentence for theft, for a total effective sentence of 31 years.

-13-

The Defendant appeals, alleging that the evidence presented at trial is insufficient to sustain his convictions, and the trial court improperly sentenced him.

## II. Analysis

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. Especially Aggravated Kidnapping

The Defendant contends that the evidence is insufficient to sustain his conviction for especially aggravated kidnapping, because, in part, parts of G.H.'s testimony "did not jive." Especially aggravated kidnapping, as charged in the Defendant's indictment, is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty . . . where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-302, -305. (2003).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's conviction. The evidence showed that G.H. requested that the Defendant and the other man, Stewart, get out of her car. After G.H. made this request, the Defendant and Stewart forcibly confined G.H., transported her to a secluded area, and she suffered serious bodily injury as a result. The Defendant admitted to the police that

-14-

he accepted a ride from G.H., but said that she and Stewart left him at a convenience store. The jury accredited G.H.'s testimony that the Defendant was present, and we will not second-guess the jury on credibility issues. Therefore, we conclude there is sufficient evidence to sustain the Defendant's conviction for especially aggravated kidnapping.

## 2. Aggravated Rape

The Defendant contends that the evidence is insufficient to support his conviction for aggravated rape. Aggravated rape is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim . . . [and] the defendant is aided or abetted by one or more persons; and force or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-502 (2003).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's conviction. The evidence at trial showed that the Defendant penetrated G.H. both vaginally and anally. G.H. said that this was done forcibly and against her will. The Defendant was aided in this crime by another man, Stewart. We conclude this evidence is sufficient sustain the Defendant's conviction for aggravated rape.

## 3. Aggravated Assault

The Defendant next contends that the evidence is insufficient to sustain his conviction for aggravated assault. Aggravated assault is "intentionally . . . knowingly . . . or recklessly commit[ting] an assault" and either "caus[ing] serious bodily injury" or "us[ing] a deadly weapon." Tenn. Code Ann. § 39-13-102 (2003). Assault is defined as occurring when a person:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101 (2003).

The evidence at trial showed that the Defendant brutally beat G.H., causing G.H. to lose consciousness repeatedly. As a result of the Defendant's beatings, G.H. suffered multiple bruises and abrasions. G.H.'s face was cut in two places, and both cuts required stitches. The Defendant bit G.H.'s breast, leaving behind swollen painful bite marks. The Defendant denies that he was present when these events took place. The jury obviously credited the victim's testimony, and, therefore, the Defendant was found guilty of aggravated assault. Therefore, we conclude this evidence is sufficient to sustain the Defendant's conviction for aggravated assault.

## 4. Theft of Property over $500.00

Finally, the Defendant contends that the evidence is insufficient to support his conviction for theft of property over $500.00. Tennessee Code Annotated section 39-14-103 (2003) reads, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Theft of property is a class E felony if the value of the property or services is more than five hundred dollars, but less than one thousand dollars. Tenn. Code Ann. § 39-14-105 (2). The evidence at trial showed that the Defendant beat and raped G.H until she lost consciousness. When G.H. awoke, the Defendant, Stewart, and G.H.'s car were gone. The police located G.H.'s car in a grocery store parking lot, directly off the road where G.H. was raped. Inside G.H.'s car, the police discovered the Defendant's sunglasses and the knife used during the kidnapping and rape of G.H. G.H. testified that she purchased the car, a 1990 Pontiac Sunbird, about one year prior to its theft, for "a little over $1000.00." We conclude that this evidence is sufficient to sustain the Defendant's conviction for theft of property over $500.00.

## B. Sentencing

The Defendant contends that the sentence imposed upon him was excessive. First, the Defendant argues that the offenses of especially aggravated kidnapping and aggravated assault should have merged into the offense of aggravated rape according to the merger doctrine in State v. Anthony. Second, the Defendant asserts that the trial court's application of sentence enhancing factors was improper in light of the United States Supreme Court's decision in Blakely v. Washington, 524 U.S. _____, 124 S. Ct. 2531 (2004).

## 1. State v. Anthony

The Defendant contends that the offenses of especially aggravated kidnapping, aggravated rape, aggravated assault, and theft should have merged in accordance with the Tennessee Supreme Court's decision in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The State counters that the Defendant's offenses are not subject to the merger doctrine set forth in Anthony. We agree with the State.

In State v. Anthony, the Tennessee Supreme Court held that due process was violated because the defendant was convicted of both kidnapping and robbery where the kidnapping was "essentially incidental" to the robbery. Id. at 306. In Anthony, the defendant detained several store employees during the commission of a robbery. Id. at 307. The Supreme Court explained that, although the language of the kidnapping statute applied to the defendant's actions, the legislature did not intend that "every robbery should also constitute a kidnapping." Id. at 306. The Court set forth the rule as follows:

[The test is] whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction. We further agree . . . that one method of resolving this question is to ask whether the defendant's conduct "substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself.

Id. (citations omitted).

The Supreme Court further explained that "the test is not whether the detention was an 'integral part or essential element' of the robbery, but whether it was 'essentially incidental' to that offense." Id.

In the case under submission, the trial court found that the offenses in question were not "essentially incidental" to one another. After thoroughly reviewing the evidence of record, we find no error in the trial court's judgment.

Subsequent to the Anthony decision, the Tennessee Supreme Court explained that "[t]he Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." State v. Dixon, 957 S.W.2d 532, 534 (Tenn. 1997). In Dixon, the defendant grabbed the victim and pinned her to the ground. Id. The defendant then dragged the victim thirty or so feet off of the lighted sidewalk and behind some nearby shrubbery. Id. The defendant beat the victim and then sexually assaulted her. Id. The Supreme Court held that the kidnapping, assault, and sexual battery offenses were separate offenses, not subject to merger under Anthony. The Court explained that the brutal beating of the victim was clearly separate from the other offenses. Further, the Court explained that when the defendant moved the victim the thirty or so feet in order to lessen his chances of detection, this was separate from and, thus, not "essentially incidental" to, the sexual battery. Therefore, the Court concluded, the aggravated kidnapping, aggravated assault, and sexual battery convictions did not merge. Id. at 535.

Similarly, in this case, the especially aggravated kidnapping, aggravated rape, aggravated assault, and theft offenses are not merged under Anthony. The evidence at trial showed that the Defendant kidnapped the victim when he forcibly detained her and drove her under the train trestle. This detainment was not "essentially incidental" to the offense of rape. The interference with the victim's liberties for which the Defendant was convicted was not the detainment of the victim during the rape, but the transportation of the victim to a separate location. This removal of the victim, like the removal of the victim in Dixon, was to a more secluded area, in order to lessen the Defendant's chances of detection. The evidence is sufficient to sustain a separate conviction on this charge. Similarly, the aggravated assault for which the Defendant was convicted was not "essentially incidental" to the rape. The assault in this case was far more than the offensive and illegal contact that is inherent in every rape. The assault was a separate and distinct beating. The Defendant severely beat G.H., including repeatedly striking G.H.'s face with his fists and biting her breasts with

-17-

enough force to leave bruised, swollen bite marks. Also, the theft of G.H.'s car was not "essentially incidental" to the rape or kidnapping charges. See Id. at 534-535. This issue is without merit.


## 2. **Blakely v. Washington**


When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; ©) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.


In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).


The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Id. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts

legally essential to the punishment." Id. at 2539.

The Defendant asserts that his sentence is excessive in light of the United States Supreme Court decision in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The State counters that the Defendant has waived this argument by not raising it in his original brief on appeal to this Court, and alternatively, that the Defendant's sentence does not violate the mandate set forth in Blakely.

First, we note that the Defendant has not waived this issue. In State v. Chester Wayne Walters, we held that, because Blakely announced a new rule, any defendant whose case was still on direct appeal could raise this issue. State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *19 (Tenn. Crim. App., at Nashville, Nov. 30, 2004). We explained that, although Blakely was the Supreme Court's explanation of its prior decision in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), the Tennessee Supreme Court had previously announced that the rule in Apprendi did not affect our State's sentencing scheme. As a result, the mandate of Blakely created a new rule in Tennessee. Furthermore, in Walters, this Court held that Blakely could be raised in all cases on direct appeal, because a violation of this mandate was plain error arising from the deprivation of the Constitutional right to a jury trial. See also State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *7–10 (Tenn. Crim. App., at Nashville, Oct. 8, 2004).

Thus, the question becomes whether the sentence imposed by the trial court violates the United States Supreme Court mandate in Blakely. At the Defendant's sentencing hearing, the trial court found that the following enhancement factors applied: (2) [t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (3) [t]he defendant was a leader in the commission of an offense involving two or more criminal actors; (6) [t]he defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; (9) [t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and (10) [t]he defendant possessed or employed a firearm, explosive, or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114. The trial court then sentenced the Defendant as follows: Count 1, Especially Aggravated Kidnapping, a Class A felony, twenty-three years; Count 2, Aggravated Rape, a Class A felony, twenty-three years; Count 3, Aggravated Assault, a Class C felony, six years; Count 4, Theft of Property over $500.00, a Class E felony, two years. In the judgment of conviction forms, the trial court ordered that the Defendant must serve the sentences for the two class A felony convictions at 100%, as a violent offender pursuant to Tennessee Code Annotated section 40-35-120 (2003). The trial court ordered that the two twenty-three year sentences run concurrently to one another and consecutively to the other two sentences, which were also ordered to run consecutively to each other. Thus, the Defendant was sentenced to an effective sentence of thirty-one years.

The sentence range for Class A felony, Range I offenders is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2003). In calculating the sentence for a Class A felony, the

presumptive sentence is the midpoint of the range, in the absence of enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210©) (2003). If there are enhancement factors but no mitigating factors, the sentence must be set at or above the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court must set a sentence at or below the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are both mitigating and enhancement factors, the trial court must adjust the sentence based on the weight it assigns to each factor. Tenn. Code Ann. § 40-35-210(d).

In calculating the sentence for a Class C or E felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210 ©). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann.§ 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e). The sentence range for a Range I offender for a class C felony is not less than three years or more than six years, and for a class E felony is not less than one year or more than two years. Tenn. Code Ann. § 40-35-112 (2003).

The Defendant has a prior history of criminal convictions, but none of the other enhancement factors used by the trial court to enhance the Defendant's sentence were submitted to a jury or admitted by the Defendant. Therefore, the rule in Blakely precludes application of any of these factors except the enhancement factor based on the Defendant's prior criminal convictions. Because there was only one enhancement factor properly applied by the trial court, the Defendant's sentence must be modified, unless the error was harmless beyond a reasonable doubt. See Walters, 2004 WL 2726034, at *22.

In Walters, this Court held that Blakely violations are subject to a Constitutional harmless error analysis. Id. at *24. "While it is true that Blakely concerns the inviolate right to a jury trial, the cornerstone upon which our criminal justice system was constructed, we cannot say that a jury's failure to determine an enhancement factor 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Id. (quoting Needer v. United States, 527 U.S. 1, 9 (1999)). Thus, before we modify the Defendant's sentence, we will "review the Blakely errors to determine whether they were harmless beyond a reasonable doubt." Id.; see Chapman v. California, 386 U.S. 18, 24 (1967).

First, we examine the trial court's application of enhancement factor (9), concerning the Defendant's prior unwillingness to comply with the terms or conditions of probation or release. The record reflects that the Defendant violated the terms or conditions of his release on more than one occasion. At the sentencing hearing, the Defendant admitted that his probation had been revoked on two occasions, once for failure to pay the requisite fees and costs, and a second time when he was arrested for the charges in the present case. There was no evidence presented to contradict this fact. Therefore, we hold that the trial court's application of enhancement factor (9) was harmless error.

Next, we turn to the trial court's application of factor (10), that the Defendant possessed or employed a dangerous or deadly weapon in the commission of the offense. The record reflects that the Defendant was accompanied and assisted by a co-defendant during the commission of this crime. The victim testified that this co-defendant was the person who held the knife during the commission of the offense. The trial court specifically stated that the possession of a weapon was not an element of any of the Defendant's charges. Thus, we are unable to conclude whether the jury would have found that the Defendant was in possession of or used a weapon in the commission of the offenses. Therefore, the trial court's application of this enhancement factor was not harmless beyond a reasonable doubt.

Third, we address the trial court's application of enhancement factor (3), that the Defendant took the role of a leader in the commission of the offense. The trial court did not provide the specific reasons for its finding that this factor should apply. Although the jury did find that the Defendant was aided and abetted by another person–as this was an element of his indictment–we decline to hold that this is necessarily the same as being the "leader" in the commission of an offense. Therefore, we conclude that the trial court's application of this enhancement factor was not harmless beyond a reasonable doubt.

Finally, we turn to the application of factor (6), that the Defendant treated the victim with exceptional cruelty. "Exceptional cruelty" is too conclusory for this Court to say that the application of this factor was harmless beyond a reasonable doubt. We conclude that this is the type of subjective conclusion that must be left within the jury's province pursuant to Blakely. Accordingly, the trial court's application of this factor is not harmless beyond a reasonable doubt.

In summary, the only enhancement factors that were properly considered by the trial court were factors (2), regarding the Defendant's history of prior criminal convictions, and (9), regarding the Defendant's history of unwillingness to comply with the conditions of probation or release into the community. Notably, the trial court placed "considerable weight" on the Defendant's prior criminal convictions, based on the close proximity of time between the prior convictions and the date of the offenses in this case. Therefore, the Defendant's sentences are modified as follows: Count 1, Especially Aggravated Kidnapping, a Class A felony, is modified from twenty-three years to twenty-two years; Count 2, Aggravated Rape, a Class A felony, is modified from twenty-three years to twenty-two years; Count 3, Aggravated Assault, a Class C felony, is modified from six years to five years. The Defendant's sentence for the theft conviction will remain the same. Additionally, we hold that the Defendant must serve an effective sentence of twenty-nine years, twenty-two of which must be served at 100%.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm all of the Defendant's convictions. Further, we reduce the Defendant's sentence to an effective sentence of twenty-nine years, twenty-two of which must be served at 100%. We remand the case for the entry of appropriate

judgments of conviction, consistent with this opinion.

_____

ROBERT W. WEDEMEYER, JUDGE